**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

---------------------------------------------------------------

BETSY BATES,

              Plaintiff,

      v.

DELMAR GARDENS NORTH, INC., and
DELMAR GARDENS NORTH OPERATING
LLC,

              Defendants.

---------------------------------------------------------------

**4:15-cv-00783-AGF**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE**

INTRODUCTION

Plaintiff Betsy Bates hereby submits this memorandum in opposition to the Defendants' motion to exclude the expert testimony and opinion of Dr. Judy Shepard-Kegl, Plaintiff's duly disclosed expert witness in this matter. ECF Doc. 61. For the reasons set forth below, Dr. Shepard-Kegl's opinion solidly meets the requirements for the admissibility of expert testimony, as set forth in Fed. R. Evid. 702 and *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (8th Cir. 2014). Defendants' motion should be denied.

BACKGROUND

Plaintiff Betsy Bates is a deaf individual who alleges that Defendants discriminated against her by failing to ensure effective communication with her during her approximately two-week-long stay at Defendants' rehabilitation facility, Delmar Gardens North. Specifically, Ms. Bates alleges that she has limited English proficiency (particularly in spoken English), but that she is

1

proficient in American Sign Language ("ASL"),[1] and that the Defendants unlawfully failed to provide her with the American Sign Language interpreter she requested and needed. *E.g.* Complaint, ECF Doc. 1, at 4–8 (Statement of Facts); Deposition of Plaintiff, Ex. 3, at 32–33, 85–86, 103–05, 113–17, 126–29, 163, 167.

To assist the trier of fact, Ms. Bates retained Dr. Judy Shepard-Kegl to provide expert testimony. Dr. Shepard-Kegl has a Ph.D in Linguistics from the Massachusetts Institute of Technology, and has been working, studying, and publishing in the fields of neurolinguistics and signed languages for over thirty years. *See generally* Shepard-Kegl Curriculum Vitae, Ex. 1. She is currently a tenured Professor of Linguistics, the Director of the Signed Language Research Laboratory, and the Coordinator of the ASL/English Interpreting Concentration of the Linguistics Major at the University of Southern Maine. *Id.* at 1. She is fluent in ASL and is a nationally certified ASL interpreter, with particularized training and experience in medical interpreting. *Id.*; *see also* Shepard-Kegl Depo., Ex. 2, at 5–11.

Dr. Shepard-Kegl was asked "to offer [her] expert opinion on the communication abilities and needs of the plaintiff." Shepard-Kegl Report, ECF Doc. 61-1, at 3. She reached this opinion by conducting a four-hour individualized assessment of Ms. Bates, which included component assessments of Ms. Bates's ability to read lips; to speak; to read and write English; and to understand and express herself in American Sign Language. Shepard-Kegl Depo. at 58–60; Shepard-Kegl Report, ECF Doc. 61-1, at 59–77 (individualized assessment). Dr. Shepard-Kegl concluded (in part) as follows:

---

[1] "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1006 (9th Cir. 2010). ASL "is best thought of as a foreign language used by American deaf people, with its own grammar and syntax." *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1026–27 (S.D.N.Y. 1995).

In my expert opinion, and based upon my assessment of her language skills in both English and ASL, Betsy Bates needed an ASL interpreter during her stay for rehabilitation, recovery, and physical therapy at Delmar Gardens North Rehabilitation Center. She was best able to participate in her health care via communication access through an interpreter. . . .

Ms. Bates's written English is insufficient to serve her full needs in this context. Her writing may have been sufficient for the most basic communication, but not for detailed discussions of her treatment and progress with her therapists and healthcare providers. In terms of physical therapy, interpreters were needed for initial assessments and initial training in her exercise program and for any changes in that program. In cases where therapy had become routine, by mutual agreement it is possible that she might forgo an interpreter for some very predictable sessions. Her lipreading is limited and her speech is not clear. In a typical physical therapy session, the patient is walked through and corrected on technique while performing various exercises. To have to pause and write back and forth during therapeutic physical therapy sessions would not allow for the same standard of care, even if her writing and reading were sufficient.

There is a clear discrepancy between Ms. Bates's fluency in ASL and her limited fluency in English. Her ASL is fluent and offers her the ability to engage with her healthcare providers in a sophisticated way that conveys the mature and competent individual that she is. It allows her to ask all the questions of her providers that she needs answered and it allows her to understand their answers. No modality of English (lipreading, speaking, reading, or writing) offers her similar access.

Shepard-Kegl Report, ECF Doc. 61-1, at 77–78.

## ARGUMENT

"Admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703."

*Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (8th Cir. 2014). The controlling standard

in this Circuit, as articulated in *Johnson*, calls for liberal admissibility of expert evidence: "As long

as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should

be tested by the adversary process with competing expert testimony and cross-examination, rather

than excluded by the court at the outset." *Id.* at 562 (emphasis added).

3

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) was intended specifically to liberalize the standard for admission of expert testimony. *See Johnson*, 754 F.3d at 561. "The *Daubert* Court held that the 1972 adoption of the Federal Rules of Evidence superseded the *Frye* test, finding that the admissibility of scientific evidence no longer was limited to knowledge or evidence 'generally accepted' as reliable in the relevant scientific community." *Id.* The four factors that the *Daubert* Court considered are "non-exclusive," and the *Daubert* Court acknowledged that many factors may be instructive to district courts. *Id.* The Supreme Court later "expressly extended its *Daubert* reasoning to all expert testimony, not simply that which was considered 'scientific.'" *Id.* at 562 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

Accordingly, in *Johnson*, the Eighth Circuit has held that "[t]he screening requirement of Rule 702 has been boiled down to a *three-part test*: First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* at 561 (citation omitted) (emphasis added).[2] "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005) (citation omitted).

---

[2] Defendants' argument focuses exclusively on the four elements set forth in the text of Fed. R. Evid. 702, without any regard for *Johnson* (the controlling case in this Circuit regarding how to apply Rule 702 in light of *Daubert*). *See Lipp v. Ginger C, L.L.C.*, No. 2:15-cv-04257-NKL, 2017 U.S. Dist. LEXIS 7415, at *3 (W.D. Mo. Jan. 19, 2017) ("Under Fed. R. Evid. 702 and the guidance set forth in *Daubert*, expert testimony should be liberally admitted." (citing *Johnson*, 754 F.3d at 562)). While Defendants' argument is flawed under either framework, the *Johnson* formulation is controlling, and under that analysis, Dr. Shepard-Kegl's opinion is admissible.

"Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) (citation omitted). Excluding admissible expert testimony is reversible error. *Johnson*, 754 F.3d at 564.

Applying the *Johnson* analysis with the liberal admissibility standard in mind, the Court should conclude that Dr. Shepard-Kegl's report, testimony, and opinion are admissible.

**1. Dr. Shepard-Kegl's Testimony Will Be Useful to the Finder of Fact in Deciding an Ultimate Issue of Fact.**

The ultimate issue in this case is whether Defendants ensured that Plaintiff was able to effectively communicate during her rehabilitative treatment at Delmar Gardens North, as required by the Americans with Disabilities Act (42 U.S.C. § 12181 et seq.), the Rehabilitation Act (29 U.S.C. § 794), and the Missouri Human Rights Act (Mo. Rev. Stat. § 213.065). Federal regulations implementing Title III of the ADA require covered entities to "furnish appropriate auxiliary aids and services," such as ASL interpreters, "where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

The parties dispute both what auxiliary aids and services Defendants provided, and whether or not those auxiliary aids and services ensured Ms. Bates effective communication. Ms. Bates claims that she is proficient in American Sign Language and not proficient in English (particularly spoken English) due to her disability. *E.g.* Complaint, ECF Doc. 1, at 4–8 (Statement of Facts); Deposition of Plaintiff, Ex. 3, at 32–33, 85–86, 103–05, 113–17, 126–29, 163, 167. She also claims that Defendants' staff exclusively used English to communicate with her. *See id*. Ms. Bates further claims that she requested an American Sign Language interpreter, and that Delmar Gardens North failed to provide one. *Id.* Essentially, Ms. Bates alleges that Defendants did not provide her with the auxiliary aid and service of an American Sign Language interpreter (*see* 28 C.F.R. § 36.303(b)),

5

and that as a result, she was not able to effectively communicate. *See generally* Complaint, ECF Doc. 1.

Defendants contend, both in this motion and in their motion for summary judgment, that "Plaintiff and [Defendants] had extensive, flowing communication, as demonstrated in part by the handwritten notes." ECF Doc. 62, at 12. Thus, Defendants contend that they provided Ms. Bates with handwritten notes[3] and that this "auxiliary aid and service" resulted in effective communication. As set forth above, Ms. Bates disputes that communicating orally or in writing was effective for her. Therefore, whether Ms. Bates was, in fact, able to effectively communicate via English (i.e., whether she was able to exchange information with Defendants' staff in a manner substantially equal to a non-disabled person) is an ultimate fact in issue. *Silva v. Baptist Health S. Fla., Inc.*, No. 16-10094, 2017 U.S. App. LEXIS 8151, at *12–20 (11th Cir. May 8, 2017); *see also Proctor v. Prince George's Hosp. Center*, 32 F. Supp. 2d 820, 827 (D. Md. 1998). Additionally, Ms. Bates's ability to communicate in American Sign Language in comparison with her ability to communicate in English is directly relevant to whether Defendants failed to offer an auxiliary aid or service (an ASL interpreter) that would have enabled her to communicate effectively at Delmar Gardens North. Fed. R. Evid. 401.

Dr. Shepard-Kegl was asked "to offer [her] expert opinion on the *communication abilities and needs of the plaintiff* as well as information regarding interpreting credentials." Shepard-Kegl Report, ECF Doc. 61-1, at 3 (emphasis added). Her opinion and testimony, as quoted above, is that Ms. Bates is not proficient in English, but is proficient in ASL. Shepard-Kegl Report, ECF Doc. 61-1, at 77–78. This testimony will be helpful to the jury for multiple reasons. Generally, the expert

---

[3] Defendants have also contended that they provided Ms. Bates with a communication board to communicate; however, this is not relevant to whether Dr. Shepard-Kegl's assessment of Ms. Bates's ability to communicate in written English is admissible.

6

testimony will help the jury understand the evidence by allowing the jury to better understand how Ms. Bates's disability impacts her ability to communicate, and the reasons why Ms. Bates was unable to communicate effectively in the context of this case.

First, this topic requires expert opinion because a jury that does not understand American Sign Language will not be able to determine whether Ms. Bates can communicate in that language.[4] Second, Dr. Shepard-Kegl's expert testimony is also helpful to help the jury determine the nature and extent of Ms. Bates's ability to communicate in English (i.e., through reading lips, speaking, reading, and/or writing). Defendants incorrectly assert that "[a]ny juror proficient in speaking, reading, and writing in English will be able to understand and judge Ms. Bates's ability to communicate in English by viewing the written notes with DG North staff and hearing Plaintiff's testimony." ECF Doc. 62, at 7. Simply reading the written notes, however, will not provide the jury with the information necessary to determine whether Ms. Bates was fully capable of understanding or expressing herself in writing. There are only *nine (9) pages* of notes on various topics, which certainly does not represent the entire universe of communications that Ms. Bates attempted to have (or could have had through an ASL interpreter) throughout her *two-week* stay at Delmar Gardens North. ECF Doc. 59-2.

Furthermore, a central issue in the case is how Ms. Bates's ability (or inability) to communicate in English compares to her ability to communicate in ASL. Dr. Shepard-Kegl offered the following conclusion on this exact issue: "It is clear that Ms. Bates is more comfortable with ASL. She is most prolific, proficient and articulate in ASL. *The quantity of information and the*

---

[4] Defendant asserts that Dr. Shepard-Kegl's testimony is unhelpful because "anyone proficient in ASL could understand Plaintiff's ability to communicate in ASL." ECF Doc. 62, at 7. Plaintiff submits that it is highly unlikely that the jury in this case will contain twelve jurors who are each fluent in ASL.

*quality of expression became successively degraded as Ms. Bates moved to written and then spoken English.*" (emphasis added). Shepard-Kegl Report, ECF Doc. 61-1, at 77. The average jury would not be able to reach this conclusion based solely on the notes or Ms. Bates' testimony. And speaking of Ms. Bates's testimony, Defendants' argument that the jury will "hear[] Plaintiff's testimony" incorrectly assumes that Ms. Bates will testify in English at trial. She will not. She is deaf, and as she did in her deposition, she will testify in ASL, through an interpreter. Thus, the English the jury will hear will be an interpretation of Ms. Bates's testimony in ASL.  Dr. Shepard-Kegl's analysis of Ms. Bates's English proficiency is especially helpful in light of this fact.

Dr. Shepard-Kegl's testimony will therefore be useful to the jury in deciding critical facts at issue in the case—in particular, whether Ms. Bates could communicate via English or ASL, and whether the auxiliary aids and services that Defendant provided to her were sufficient to ensure effective communication. *See Silva,* 2017 U.S. App. LEXIS 8151, at *19 (noting that effective communication claims require a "fact-intensive inquiry" that considers plaintiffs' "claimed impairments in their ability to exchange . . . relevant information with Defendants' . . . staff.); *see also Bravin v. Mount Sinai Med. Ctr.*, 58 F. Supp. 2d 269, 273 (S.D.N.Y. 1999) ("what constitutes effective communication is a question of fact"). That Dr. Shepard-Kegl's opinion embraces this ultimate factual issue squarely does not transform it into a legal opinion, and indeed makes her opinion even more helpful to the trier of fact. *See* Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue.").[5] Dr. Shepard-Kegl's testimony is both

---

[5] *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.D.C. 1997) is distinguishable; in that case, the expert's testimony literally tracked the language of the applicable regulations, rendering it a legal conclusion. *Id.* As that court noted: "It may well be permissible for an appropriate expert to testify as to the difficulty an individual like [the plaintiff] would have communicating with [an agent of the defendant] under the circumstances. It may also be permissible for an appropriate expert to testify concerning the relative merits of alternative forms of communication." *Id.* This is precisely what Dr. Shepard-Kegl has done in her opinion.

useful and necessary, and should not be excluded. *Clark*, 150 F.3d at 915 ("Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility.").

### 2. Dr. Shepard-Kegl Is Qualified to Assist the Finder of Fact.

Defendants have made no argument that Dr. Shepard-Kegl herself is *unqualified* to assist the finder of fact; instead, Defendants' argument is limited to her methodology and the content of her opinion. As set forth above, Dr. Shepard-Kegl is an experienced ASL interpreter with an academic background and career spanning over 30 years in the fields of neurolinguistics, signed languages, and American Sign Language specifically. *See generally* Shepard-Kegl Curriculum Vitae, Ex. 1; *see also* Shepard-Kegl Depo., Ex. 2, at 5–11. These credentials render Dr. Shepard-Kegl qualified to assist the finder of fact. *See Johnson*, 754 F.3d at 562 n.3.

Defendants selectively and misleadingly quote from Dr. Shepard-Kegl's deposition in an attempt to discredit her qualifications. *See* ECF Doc. 62, at 8–9. Defendants spuriously attack Dr. Shepard-Kegl by claiming that she "clearly does not understand the meaning of the legal terminology she is using." *Id.* However, an honest reading of the deposition pages that Defendants cite reveals that Dr. Shepard-Kegl was not able to answer Defendants' counsel's questions about legal terms because the questions themselves were incomplete, misleading, or both. Dr. Shepard-Kegl testified that written materials were "not really" a type of auxiliary aid *for Ms. Bates in the context of this case*. Shepard-Kegl Depo. Ex. 2 at 92 ("It's not equivalent to the communication that she's capable of with an interpreter."); *id.* at 95 ("I don't know why -- I'm thinking it's an auxiliary aid *for her*. I don't want -- I don't want to have things mislead that I would actually recommend that that's the auxiliary aid that would be appropriate for Ms. Bates.") (emphasis added).

Dr. Shepard-Kegl is assuredly qualified to assist the jury. Her testimony has indeed been admitted over objections in two different cases, *Saunders v. Mayo Clinic*, No. 13-1972, 2015 U.S. Dist. LEXIS 21824 (D. Minn. Feb. 24, 2015), and *Maine Human Rights Commission v. Sunbury Primary Care, P.A.*, 770 F. Supp. 2d 370 (D. Me. 2011).[6] While Defendants argue that these cases are from different courts and are therefore not "binding," it should not discourage this Court from considering them, because courts in this Circuit determine expert qualification in part based upon whether the expert, or the type of opinion, has been qualified in the past by a court of competent jurisdiction. *United States v. Williams*, No. 13-00236-01/03-CR-W-DGK, 2017 U.S. Dist. LEXIS 67399, at \*52 n.41 (W.D. Mo. Apr. 7, 2017); *Grinnell Mut. Reinsurance Co. v. Heritage Ins. Agency*, No. 00-1632 (DWF/AJB), 2001 U.S. Dist. LEXIS 26169, at \*16 (D. Minn. Aug. 10, 2001) ("[The expert] is a 40-year veteran of the insurance industry. Insurance expert testimony has been properly admitted by other courts based on years of experience in the insurance industry.").

Each of the two cases mentioned above involved Dr. Shepard-Kegl's individualized assessment of a deaf person's communication abilities and needs, using the same methodology she used in this case. *Saunders*, 2015 U.S. Dist. LEXIS 21824, at \*4–5; *Maine Human Rights Commission*, 770 F. Supp. 2d at 391. In *Saunders*, the defendant hospital raised the same objections as the Defendants here do, and the court correctly concluded that those objections went to the weight of the testimony, not its admissibility. 2015 U.S. Dist. LEXIS 21824, at \*4–5. Similarly, in *Maine Human Rights Commission*, the court held that Dr. Shepard-Kegl's opinion was based on appropriate facts and sound reasoning, including her "extensive examination" of the deaf individual. 770 F. Supp. 2d at 391. In both of these cases, the analysis of the defendants' objections

---

[6] Defendants have not pointed to a case in which Dr. Shepard-Kegl's opinion has been excluded, and Plaintiff is also unable to find one.

was appropriately succinct because, as here, the objections were without merit. Therefore, these cases are persuasive, and the Court should consider them.[7]

### 3. Dr. Shepard-Kegl's Report and Testimony Are Reliable and Trustworthy.

Dr. Shepard-Kegl applied sound methodology in reaching her opinion, rendering her opinion reliable and trustworthy in an evidentiary sense. *Johnson*, 754 F.3d at 561. Each component of Dr. Shepard-Kegl's comprehensive assessment has been independently peer-reviewed. Shepard-Kegl Depo., Ex. 2 at 57; 128–30. Her process is based upon the application of her expertise and experience to available research in her field, and is then customized to the needs of each particular assessment. *Id.*; *id.* at 61–62; 83–86.  Dr. Shepard-Kegl utilized a "single case study" methodology, which she described in her report as follows:

> The standard methodology used in my profession is elicitation and linguistic analysis. The process is very much like the experimental method. A hypothesis is posed and data are elicited to help me to confirm or disconfirm the hypothesis. Standardized testing will not give me the individualized data that I need to inform my opinion. Deaf people are far too diverse and their language backgrounds are very heterogeneous. I need to look at each client in an individualized way, using a *single case study methodology*. *The need for individualized assessment is noted by almost every researcher in the field of deafness, especially regarding reading abilities*, but some of these opinions are addressed quite well in the following text. Mounty, Judith and Martin, David S. (eds.) 2005. Assessing Deaf Adults: Critical Issues in Testing and Evaluation. Washington, D.C.: Gallaudet University Press.
>
> That is not to say that I do not at times make use of standard materials that have been developed to assess reading, interpreting proficiency, or ASL proficiency. I just do not apply them in a one-size fits all fashion. *I have relied here upon pre-vetted grade-level vocabulary lists from research on basal readers, from informal assessments such as the Flynt Cooter Reading Inventory and the San Diego Reading Screening*. In the beginning of this report I will provide some general background on interpreting and ASL followed by a discussion of the various

---

[7] Additionally, Dr. Shepard-Kegl has testified at trial "six or seven" times, meaning there have been multiple other cases in which she has rendered a similar opinion and the opposing party has not challenged it. Shepard-Kegl Depo., Ex. 2 at 39.

strategies I have used to elicit the data I needed to form my opinion in this case. At the end of this report, I will present the findings regarding the specific plaintiffs in this case.

Shepard-Kegl Report, ECF Doc. 61-1 at 4 (emphases added).

Defendants purport to attack Dr. Shepard-Kegl's methodology, but are unable to identify any specific deficiencies in it, except that she is the only one who uses this particular methodology. Def. Mem., ECF Doc. 62, at 2, 11–13. This argument is unpersuasive. While there are other individuals who conduct linguistic assessments of deaf individuals, Dr. Shepard-Kegl's is unique in its thoroughness. Shepard-Kegl Depo., Ex. 2 at 45–50. Her methodology reflects expertise gathered over years of research and practice in her field, and is well-substantiated throughout her report by references to other reputable sources. *See id.*[8] She has conducted these assessments on

---

[8] Dr. Shepard-Kegl cites the sources for her knowledge and methodology throughout her report; what follows are examples of places and contexts in which she does so (with the actual citations omitted, as indicated in brackets, to improve readability). *E.g.* Shepard-Kegl Report, ECF Doc. 61-1, at 22 ("It is standard practice in language assessments to pick out certain grammatical competencies that are indicative of grammar mastery as a whole. Exhaustively testing every single component of ASL grammar would be highly inefficient and overly cumbersome. . . . This practice has been followed in the ASL Checklist developed by Dr. Judith Mounty when she was at Educational Testing Services: [citation]. I served as the linguistic consultant to Dr. Mounty as she developed this checklist and the training manuals for using it. This practice was also followed by Supalla and Newport in their development of a Test Battery for American Sign Language Morphology and Syntax: [citation]. This and other ASL assessments are reviewed in [citation]"); *id.* at 25 ("The Topological Relations Task was originally designed by Melissa Bowerman to elicit expressions of spatial relations from young children. It was developed further by Bowerman and Pedersen to elicit spatial relations for crosslinguistic comparison, the purpose I am using it for here. These stimuli have been used in linguistic fieldwork all over the world. [citation]); *id.* at 37 ("[T]he absence of copular constructions is characteristic of the English of both signing and non-signing deaf individuals. The inconsistent use or omission of copulars was also noted in [citation]. For background on the use of argument structure as an indicator of syntactic deficits see [three other citations].") *id.* at 41 ("Numerous studies have addressed the reading and English grammar levels of Deaf individuals: [six citations]."); *id.* at 45 ("To pin down the reading level more precisely, I present clients with a series of graded reading passages taken from the Flynt-Cooter Reading Inventory. This reading inventory presents a set of three sentences at each grade level to screen for reading ability. Based on performance with the screening sentences, the individual is then presented with a reading passage at one or more of the targeted grade levels to better determine the reading level. [citation]"); *id.* at 47 ("One final screening test serves to corroborate

12

approximately 300 different deaf individuals over the course of her career. *Id.* at 54. Accordingly, her opinion is the product of reliable principles and methods. Fed. R. Evid. 702(c).

As outlined above, Dr. Shepard-Kegl's methodology is valid, and Defendants have not offered any competing testimony or evidence to rebut its validity. Accordingly, Defendants' "fleeting challenge to [Dr. Kegl's] conclusions and methodology, without evidence or support for that challenge . . . is unsubstantiated." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 400–01 (S.D.N.Y. 2015) (denying motion for summary judgment in part because challenge to expert's methods consisted of "nothing more than attorney argument," and the "[d]efendants did not offer the opinion of a single expert discrediting or casting doubt on [the expert's] methodology")).

Defendants further argue that Dr. Shepard-Kegl's opinion is inadmissible because she did not consider evidence that the Defendants (or, more accurately, the Defendants' attorneys) regard as important. ECF Doc. 62 at 11–13. However, this goes to the weight of the expert evidence, not its admissibility. *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (citation omitted). Dr. Shepard-Kegl's opinion is based on her 4-hour personal, individualized assessment of the Ms. Bates, as informed by her considerable education and experience in her field. Shepard-Kegl Depo. at 58–60; *see generally* Shepard-Kegl Report, ECF

---

my assessment of reading level. The San Diego Quick Reading Assessment is a quick screening based upon selected vocabulary alone that determines the reading level at which one would be expected to read independently (missing one or fewer words); to read well with educational supervision (missing two), to read with frustration (missing three or more)."); *id.* at 55 ("The Koumal cartoons (of which there are many) have a history of use as stimuli for the study of the writing of Deaf students. The National Technical Institute for the Deaf started using them in 1972 to elicit one component of a communication profile for entering college students. [three citations]).

Doc. 61-1. As set forth earlier, this comprehensive assessment included peer-reviewed component assessments of Ms. Bates's ability to read lips; to speak; to read and write English; and to understand and express herself in American Sign Language. Shepard-Kegl Depo. at 58–60; Shepard-Kegl Report, ECF Doc. 61-1, at 59–77 (individualized assessment). This examination provided facts and data sufficient for Dr. Shepard-Kegl to render her opinion regarding Ms. Bates's communication abilities and needs. Fed. R. Evid. 702(b). Defendants' argument that Dr. Shepard-Kegl's opinion is inadmissible because she did not review certain other information does not provide a basis to exclude her testimony, because the information that she did review provided a sufficient basis for her opinion. *See Hartley*, 310 F.3d at 1061 ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). If Defendants wishe to challenge Dr. Shepard-Kegl's report and testimony, Defendants are free to do so through cross-examination. *See id.*

CONCLUSION

The Court should deny Defendants' motion to exclude the expert testimony of Dr. Judy Shepard-Kegl.

Respectfully submitted,

EISENBERG & BAUM, LLP


By: _____
Andrew Rozynski, Esq.
24 Union Square East, Fourth Floor
New York, NY 10003
(212) 353-8700
*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing, along with Exhibits 1–3 hereto, was filed electronically with the Clerk of the Court to be served by the Court's electronic filing system this 1st day of August, 2017.

Andrew Rozynski, Esq.