## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

-------------------------------------------------------------

BETSY BATES,

              Plaintiff,

      v.

DELMAR GARDENS NORTH, INC., and
DELMAR GARDENS NORTH OPERATING
LLC,

              Defendants.

-------------------------------------------------------------

**4:15-cv-00783-AGF**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### INTRODUCTION

Plaintiff Betsy Bates submits this memorandum in response to the motion for summary judgment filed by Defendants, Delmar Gardens North, Inc. and Delmar Gardens North Operating, LLC. For the reasons set forth below, Defendants' motion should be denied.

### BACKGROUND

Plaintiff refers the Court to her Local Rule 7-4.01(E) Statement of Facts (hereinafter "PSOF"), in which she responds to Defendants' corresponding statement and provides her own statement of the facts at issue in this case.

Plaintiff Betsy Bates is a deaf individual who spent nearly two weeks at Defendants' rehabilitation facility, Delmar Gardens North, following hip surgery in 2013. PSOF ¶¶ 1, 151. She alleges that during her stay, Defendants discriminated against her in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq.; the Rehabilitation Act of

1973 ("RA"), 29 U.S.C. § 794; and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010 et seq.[1] Complaint, ECF Doc. 1.

Ms. Bates has presented evidence that her ability to communicate in English is limited (particularly for spoken English), but that she is proficient in American Sign Language ("ASL").[2] PSOF ¶¶ 145–148. The record shows that Ms. Bates requested ASL interpreters initially, repeatedly, and throughout her stay at Delmar Gardens North. *Id.* ¶ 149. Faced with these repeated requests, the record shows that Defendants did not once contact an interpreting agency; instead, Defendants contacted a community college and a "volunteer with ties to the deaf community," and when neither of them offered interpreting services, Defendants took no further action. *Id.* ¶¶ 76– 78. Instead, Defendants' staff insisted on communicating with Ms. Bates in speech and in writing— methods that were ineffective for Ms. Bates. *Id.* ¶¶ 150–154. Consequently, she was unable to understand and participate in her care and treatment, and in other activities that non-deaf residents enjoy. *Id.* ¶ 154, 159. For example, without an interpreter, the record shows that Ms. Bates could not understand discussions with nurses and therapists; could not understand what time meals were served, or what medication she was being given; and had to communicate with her physical therapists through gestures, which was burdensome and ineffective. *Id.* ¶¶ 91–95, 154. Defendants therefore unlawfully failed to provide Ms. Bates with the ASL interpreter she requested and needed to effectively communicate throughout her 13-day rehabilitation. *Id.* ¶¶ 145–153. Ms. Bates suffered emotional distress as a result of this discrimination. *Id.* ¶ 155.

---

[1]     Plaintiff withdraws her claims under the federal Fair Housing Act, 42 U.S.C. § 3601, et. seq., in light of Defendants' motion.

[2]     "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1006 (9th Cir. 2010). ASL "is best thought of as a foreign language used by American deaf people, with its own grammar and syntax." *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1026–27 (S.D.N.Y. 1995).

The only question in this case is whether Defendants ensured that Ms. Bates was able to effectively communicate throughout her stay at Delmar Gardens North. Because this question involves a fact-intensive inquiry, and because there a genuine disputes regarding those facts, summary judgment must be denied.

<u>LEGAL STANDARD</u>

Summary judgment is appropriate only when the pleadings, depositions, and other documents in the record show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56. The moving party has the burden of demonstrating that no genuine issue of material fact exists, and the record must be viewed in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Furthermore, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.*

A court may only consider admissible evidence when ruling on a summary judgment motion. *Woods v. Wills*, 400 F. Supp. 2d 1145, 1171 n.13 (E.D. Mo. 2005) (citing *Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003)). "On summary judgment, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. . . . And when an objection is made, the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Cribbs v. Accredited Collection Servs.*, No. 8:15-CV-313, 2017 U.S. Dist. LEXIS 44497, at *8 (D. Neb. Mar. 27, 2017).

<u>ARGUMENT</u>

**1. Defendants Failed to Ensure Effective Communication with Plaintiff Throughout Her Medical Care**

To assert her discrimination claims in this case, Plaintiff must show that (1) she is disabled and otherwise qualified to receive the Defendants' healthcare services; (2) Delmar Gardens North is a place of public accommodation (for ADA purposes) and receives federal funding (for Rehabilitation Act purposes), and (3) Defendants discriminated against her because of her disability. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 447 (8th Cir. 2013).[3] The first and second elements are not disputed. ECF Doc. 58, at 7 n.1.

Ms. Bates can prove the third element by showing that Defendants failed to accommodate her disability. "Congress recognized in enacting the ADA that individuals with disabilities continually encounter various forms of discrimination, including communication barriers." *Argenyi*, 703 F.3d at 447 (citing 42 U.S.C. § 12101(a)(5)). "In furtherance of the congressional purpose, Title III of the ADA prohibits places of public accommodation . . . from discriminating against individuals with disabilities in the *full and equal enjoyment* of the privileges,  advantages, or accommodations they offer." *Id.* at 448 (citing 42 U.S.C. § 12182(a)) (emphasis added) (internal quotations omitted). Accordingly, the law requires places of public accommodation to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities . . . and instruct[s] places of public accommodation to consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication." *Id.* (citing 28 C.F.R. § 36.303(c)(1)) (internal quotations

---

[3]      The substantive requirements of the MHRA are construed conterminously with these federal laws. *See Shaver*, 350 F.3d at 719.

omitted); *see also* 45 C.F.R. § 84.4(b)(2). "Auxiliary aids and services" is defined to include interpreters. 28 C.F.R. § 36.303(b)(1).

Ms. Bates has presented evidence that she requested, and that she required, an American Sign Language interpreter to help her communicate at Delmar Gardens North. PSOF ¶¶ 145–49. Dispute this, Defendants argue that an interpreter to enable effective communication is not a "necessary" accommodation, but rather a "preferred" accommodation. ECF Doc. 58 at 6. In doing so, Defendants ignore controlling precedent in this Circuit that contradicts their proposed meaning of the term "necessary." *Argenyi*, 703 F.3d at 448. As *Argenyi* explains, "Congress required public accommodations and entities which receive public funding to furnish reasonable auxiliary aids and services so that all individuals have an equal opportunity to gain 'a like' or 'equal' benefit." *Id.* at 550. Therefore, "the ADA and the Rehabilitation Act require [the Defendants] to start by considering how [their services] are used by non-disabled [patients], and then take reasonable steps to provide [Ms. Bates] with a *like experience*." *Id.* at 550 (citation omitted) (emphasis added) (reversing grant of summary judgment to university that failed to provide sign language interpreters to a deaf student, on the basis that that the student demonstrated that "he was unable to follow lectures and classroom dialogue or successfully communicate with clinical patients.").

Thus, contrary to Defendants' argument, Defendants did not fulfill their legal obligation merely by providing Ms. Bates with adequate medical treatment (and this is not a medical malpractice case). Instead, because Ms. Bates has a disability that impacts her ability to communicate, Defendants were required to ensure that Ms. Bates could communicate effectively, both about her medical care and with regard to any other service that Defendants offer to hearing (i.e. non-deaf) persons. A denial of meaningful access to Defendants' services occurs "whenever" a patient "cannot communicate medically relevant information effectively with medical staff."

5

*Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 834 (11th Cir. 2017) (reversing summary judgment on similar facts).[4] Importantly, "the task of determining whether an entity . . . has provided appropriate auxiliary aids where necessary is inherently fact-intensive." *Id.* at 836 (citation omitted).

The Eleventh Circuit Court of Appeals recently addressed the legal standard for deaf plaintiffs alleging ineffective communication in a medical setting, and aptly summarized the law in this area as follows:

> The ADA and RA focus not on quality of medical care or the ultimate treatment outcomes, but on the *equal opportunity to participate in obtaining and utilizing services*. . . . There can be no question that the exchange of information between doctor and patient is part-and-parcel of healthcare services. Thus, regardless of whether a patient ultimately receives the correct diagnosis or medically acceptable treatment, that patient has been denied the equal opportunity to participate in healthcare services *whenever he or she cannot communicate medically relevant information effectively with medical staff*. It is not dispositive that the patient got the same ultimate treatment that would have been obtained even if the patient were not deaf. . . . Instead, what matters is whether the handicapped patient was afforded auxiliary aids sufficient to ensure *a level of communication about medically relevant information substantially equal to that afforded to nondisabled patients*. In other words, the ADA and RA focus on the communication itself, not on the downstream consequences of communication difficulties, which could be remote, attenuated, ambiguous, or [even] fortuitous.

---

[4]    *See also Proctor v. Prince George's Hosp. Center*, 32 F. Supp. 2d 820, 827 (D. Md. 1998) ("The real inquiry is whether equal opportunity was provided *during* the course of Plaintiff's treatment. The treatment in this case involved several distinct procedures for which consent and follow-up were required *and a period of physical therapy*. [The deaf plaintiff] had a right under the Rehabilitation Act to benefit equally from each of these services and to participate equally at all points in time.") (second emphasis added).

*Silva*, 856 F.3d at 834 (emphases added) (citations omitted). Moreover, in this case, a "like benefit" includes the ability to participate in recreational activities that Defendants make available to all non-deaf patients at Delmar Gardens North. *Argenyi*, 703 F.3d at 448; PSOF ¶ 158.

Plaintiff has presented evidence that, without an ASL interpreter, she was not able to understand and participate in her own care in a manner substantially equal to that afforded to non-deaf patients. PSOF ¶¶ 145–154. Specifically, she testified that she could not understand discussions with nurses and therapists; that she could not understand what time meals were served, or what medication she was being given; and that she had to communicate with her physical therapists through gestures, which was burdensome and ineffective. *Id.* ¶¶ 91–95, 154. Regarding her medication, Ms. Bates testified that Defendants staff gave her different-looking pills, and that she was concerned that it was not the correct medication, but that she was unable to communicate with staff to find out whether the medication was correct. *Id.* ¶¶ 93–95. Ms. Bates's testimony, while sufficient by itself, is corroborated by Defendants' own medical records and by expert testimony about her communication abilities and needs. *Id.* ¶¶ 145–154. Her experience, as described by the record, therefore does not constitute a "like benefit" under the law.

Having adduced substantial evidence that she was unable to understand and participate in her medical care, Ms. Bates has met her burden on summary judgment. She is not required to specify exactly what information she missed, or what she could not understand: "It would be exceedingly difficult for a deaf patient to recount a conversation he or she could not hear—just as it would be hard for blind patients to describe the contents of materials they could not read." *Silva*, 856 F.3d at 835. Courts have therefore rejected "a requirement that a disabled patient explain exactly what was poorly communicated when that patient could not know that information precisely because of the disability." *Id.*; *see also Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250,

269–70 (D.D.C. 2015). For this reason, it is disputed whether consent forms, care instructions, patient rights, or discharge instructions were explained to Ms. Bates. Defendants' corporate witness testified that documents on these topics are given to all patients. PSOF ¶ 153. Ms. Bates testified that she asks for such documents to be explained because she cannot read them, but Defendants' corporate witness testified that no interpreter is ever provided (to Ms. Bates or otherwise) to explain such forms. *Id.* ¶¶ 28–30, 146, 153. Thus, there is a strong inference in the record that Ms. Bates was made to sign consent forms without understanding them. It is not possible, nor is it required, to construct more than an inference, because Ms. Bates cannot specify what she cannot understand. *Silva*, 856 F.3d at 835; *see also Anderson*, 477 U.S. at 255 (1986) ("all justifiable inferences are to be drawn in [the nonmovant's] favor.").

Defendants nonetheless argue that because Ms. Bates was able to overcome her disability to request a new room, a walker, closed captioning, and ice for her hip, she was able to effectively communicate throughout her medical care. ECF Doc. 58 at 4. This results-based argument ignores the law, as set forth above. *See Silva*, 856 F.3d at 834. It also ignores the notes in Ms. Bates' medical records that she verbalized "with difficulty." PSOF ¶¶ 45, 54, 57, 58, 59. That Ms. Bates may have been able to "get by" with extra effort in certain circumstances does not mean no accommodation was necessary. *See Sturz v. Wisconsin Dep't of Corrections*, 642 F. Supp. 2d 881, 888 (W.D. Wisc. 2009) ("A paraplegic might be able to get out of her wheelchair and pull herself up a flight of stairs as well, but that does not mean an employer may refuse to install a ramp or an elevator on that ground. Reasonable accommodations include more than just things that are medically necessary.").

Defendants also argue that the nine (9) pages of written notes prove, as a matter of law, that Ms. Bates was able to communicate effectively in writing throughout her medical care. *Id.* But it is disputed whether this written communication was effective for Ms. Bates. PSOF ¶¶ 145, 146.

8

And even if it were effective, the nine pages of notes certainly do not capture the full extent of communications that Ms. Bates attempted to have, or could have had with the benefit of an interpreter, throughout her two-week stay at Delmar Gardens North. *Id.* ¶¶ 91–95, 145, 154. Ms. Bates testified, for instance, that the nurses at Delmar Gardens North did not communicate with her in writing, but instead used only speech. *Id.* ¶ 53.

Defendants' remaining evidence is unconvincing at best,[5] and consists merely of their staff's opinion testimony that communication was effective. This evidence is not enough for summary judgment; even if Defendants' staff believed that they were communicating effectively with Ms. Bates on any particular occasion, their opinion about whether *Ms. Bates* was able to understand *them* "amount[s] to entirely uninformed speculation that provides no support for any motion for summary judgment." *Pierce*, 128 F. Supp. 3d at 269–70; *see also Borngesser v. Jersey Shore Med. Ctr.*, 774 A.2d 615, 621 (N.J. App. Div. 2001) (holding that whether hospital staff thought communication was effective is irrelevant; the Rehabilitation Act inquiry must focus

---

[5]     For example, Defendants' corporate witness, administrator Kathleen Gray, was asked how Defendants came to their conclusion that Ms. Bates was able to communicate through lip-reading. PSOF ¶ 52. Her responses show that there is no basis for this conclusion:
Q. What are the other means of communication?
A. She was able to speak and read lips.
Q. How does Delmar Gardens know that Ms. Bates is able to read lips?
A. She was able to read lips.
Q. Was there a formal test done on her lip reading abilities as far as you're aware?
A. No.
Q. Was there an informal test of her lip reading abilities?
A. No.
Q. So how does Delmar Gardens know that she can read lips?
A. Because she was able to read lips.
Q. Can you give me any more detail other than because she was able to?
A. It's in the documentation with the nurses as well.
Q. So as you sit here right now, are you aware of any more detail as to why Delmar Gardens believed that she could read lips?
A. Because she could.
*Id.* (citing Gray Dep., Ex. 3, at 31).

"upon the qualified handicapped person and whether, objectively, he or she in fact had sufficient communication with the recipient so as to have understood what was occurring and to be able to participate in and benefit from the federally funded services, as much as a similarly situated nonhandicapped person could have").[6] Because Defendants' staff's opinions are speculative, they cannot support summary judgment. *See Bac Local Union 15 Pension Fund v. Lonnie Cromwell Masonry*, No. 02-00074-CV-W-HFS, 2002 U.S. Dist. LEXIS 24289, at *17 (W.D. Mo. Nov. 25, 2002) (citing *Matsushita Elec. Indus. Co. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Thus, based on the admissible evidence, there are genuine disputes regarding whether Ms. Bates was able to effectively communicate throughout her medical care at Delmar Gardens North, and Defendants are not entitled to summary judgment.

### 2.   The Medical Records Are Not Admissible for the Purposes Offered by Defendants

#### A.   Defendants' own medical records contain unfounded lay opinions.

To rebut Plaintiff's evidence, Defendants cite extensively to entries in Delmar Gardens North records in which Defendants' staff note the method they used to communicate with Ms. Bates, and then opine on whether Ms. Bates was able to understand them. PSOF ¶¶ 43–47, 54–63. This evidence is inadmissible.

It is true that lay witnesses may offer an opinion about whether another person could understand them. Fed. R. Evid. 701; *United States v. Curescu*, 674 F.3d 735, 740 (7th Cir. 2012). However, such an opinion requires proper foundation, which the medical records here do not provide. "[A] witness offering a lay opinion must base his opinion on his own personal knowledge,

---

[6]     Defendants' citation to *Borngesser* is confusing, and implies that the court held that written notes were enough *by themselves* to ensure effective communication. ECF Doc. 58, at 9. That is not the court's holding; the court in *Borngesser* chose not to disturb a *jury's verdict* that written notes were effective in certain instances, but reversed the verdict otherwise due to improper jury instructions.  774 A.2d at 629.

which must be established to the court and jury. *When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 because there is no way for the court to assess whether it is rationally based on the witness's perceptions.*" *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (emphasis added). The records here do not identify any objective bases for the medical providers' opinions that Ms. Bates was "able to make [her] needs known," or that she "can read lips," or that she was "able to communicate." PSOF ¶¶ 43–47, 54–63. In the same way that a witness on the stand would not be permitted to testify that a person was "angry" without setting forth the observations that led to that belief, the medical professionals whose notes appear in the records must set forth what they observed that led them to believe that Ms. Bates was able to communicate (i.e., to both understand and be understood). The writers of these entries may testify to these opinions at trial upon laying proper foundation; but these bare entries from the medical records lack foundation, and are therefore inadmissible. Fed. R. Evid. 701; *Garcia*, 291 F.3d at 140. Thus, the conclusory opinion statements in Defendants' medical records do not support Defendants' motion.

## B. The third-party medical records are inadmissible on multiple grounds.

Defendants also bolster their argument with third-party medical records from DePaul Hospital (Def. Ex. D), Esse Health DDS (Def. Ex. E), and Christian Hospital (Def. Ex. F)—places where Ms. Bates has received other medical treatment at various times. These records are cited for the proposition that Ms. Bates has received medical treatment at other places without an interpreter, and that she therefore did not need one at Delmar Gardens North. ECF Doc. 58 at 4.[7] However, none of these records are admissible to defeat Ms. Bates' present claims against these Defendants.

---

[7]     The DePaul records actually show that Plaintiff received interpreters *most* of the time at DePaul—including during physical therapy sessions. PSOF ¶ 34 (citing DePaul Records at 31 ("Patient is deaf; interpreter present throughout treatment"); *id.* ("Admission navigator and

First, the records are inadmissible to defeat liability because they constitute after-acquired evidence. The DDS records and the Christian Hospital records were not in Defendants' possession when Ms. Bates was at Delmar Gardens North; indeed, they were not in Defendants' possession until during this lawsuit, because Defendants moved the Court to compel their production. ECF Doc. 35. Furthermore, even though some of the DePaul records were in Defendants' possession when Ms. Bates transferred from DePaul to Delmar Gardens North, Defendants' administrator confirmed that Delmar Gardens North staff did not review those records. PSOF ¶ 42. Accordingly, the contents of these records did not inform Defendants' decision to decline Ms. Bates's requests for an interpreter. They are therefore after-acquired evidence, which cannot be used to escape liability now. *See Seegert v. Monson Trucking, Inc.*, 717 F. Supp. 2d 863, 868 (D. Minn. 2010) (after-acquired evidence may limit prospective relief, but cannot defeat liability) (citing *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 358 (1994)). "The rule against using after-acquired evidence is based on the commonsense principle that discriminatory intent cannot be rebutted by facts of which the alleged discriminator was unaware." *Frilando v. Bordentown Driver Training Sch., LLC*, No. 2:15-cv-02917-KM-JBC, 2017 U.S. Dist. LEXIS 118067, at *50 (D.N.J. July 27, 2017). Here, the only information upon which Defendants' staff based their decision to deny Ms. Bates's request for an interpreter was that Ms. Bates was a deaf individual who was requesting an interpreter, combined with their own opinions of whether she needed one. PSOF ¶¶ 42, 149. Thus, the Court may not use the third-party medical records to decide liability on summary judgment.

---

education completed with assistance of interpreter."); *id.* at 32, 36 ("interpreter present during treatment"); *id.* at 36, 37 ("Patient is Deaf. Interpreter present during entire interview."); *id.* at 38 ("Interpreter at bedside most of the day."); *id.* at 39 ("conversant through interpreter at bedside"); *id.* at 41, 42 ("Interpreter present throughout session to assist with communication."); *id.* at 43 ("interpreter . . . at bedside"); *id.* at 43, 44 ("Eval with Interpreter present due to impaired hearing."); *id.* at 44 ("Interpreter present at treatment."); *id.* at 53 ("Interpreter at bedside till 3 pm today.")).

Second, the portions of the records cited by the Defendants consist of improper lay opinion testimony. Specifically, Defendants cite entries by medical professionals at those other hospitals indicating how those medical professionals communicated with Ms. Bates, containing either explicit or implicit opinions about whether Ms. Bates was able to communicate via those methods. PSOF ¶¶ 35–39 (DePaul), 113–124 (DDS), 128–135 (Christian Hospital). For the same reasons explained above pertaining to Defendants' own medical records, these conclusory statements constitute unfounded lay opinion testimony, which is inadmissible. Fed. R. Evid. 701; *Garcia*, 291 F.3d at 140.

Third, these records constitute only *impeachment* evidence within the context of this case, which the Court may not consider on summary judgment. *Anderson*, 477 U.S. at 247–48. These records do not refute the undisputed fact that Ms. Bates requested an interpreter, and told staff that she needed one, at Delmar Gardens North. PSOF ¶ 149. These records also have no bearing on whether *Defendants'* staff effectively communicated with Ms. Bates. That is, whether Ms. Bates communicated effectively at a different hospital is not probative of whether *Defendants'* communications with her were effective.[8] Instead, Defendants offer these records only to show that Ms. Bates has been lying (or mistaken) about her need for an interpreter at Delmar Gardens North. ECF Doc. 58 at 10–11. This is quintessential impeachment evidence—as such, the Court may not consider it on summary judgment.[9] *Anderson*, 477 U.S. at 247–48 (credibility determinations are inappropriate at summary judgment).

---

[8] As Dr. Shepard-Kegl's Report explains, there are a variety of different contextual reasons why an interpreter may be needed in some situations but not others. *See* Shepard-Kegl Report at 5-20.

[9] Plaintiff sought to limit disclosure of these third-party records earlier in this case. *See* ECF Doc. 38. The Court permitted their disclosure. ECF Doc. 41. Plaintiff's concession at that time that the records would be "relevant solely to determine how Plaintiff communicates with her providers in a medical setting" (ECF Doc. 38) differs from and does not affect the present argument that

### C.  Plaintiff Is Entitled to Compensatory and Punitive Damages

Plaintiff is only entitled to recover compensatory damages[10] on her Rehabilitation Act[11]

claim if Defendant acted with discriminatory intent. *Meagley v. City of Little Rock*, 639 F.3d 384,

388 (8th Cir. 2011). This does not mean that Defendants must have acted with personal ill will or

animosity toward Ms. Bates; rather, this standard is met if Defendants were "deliberately

indifferent" to Ms. Bates's right to be free from disability discrimination. *Id.* Put differently, Ms.

Bates must show that Defendants acted with conscious disregard for her rights. *AP v. Anoka-

Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1147 (D. Minn. 2008). Such conscious

disregard exists if either Defendants actually knew that their actions would violate Ms. Bates's

rights, or such a violation is the plainly obvious consequence of the defendant's actions. *Id.* More

specifically, in a failure to accommodate case, a plaintiff can show deliberate indifference by

proving the following elements: (1) that the plaintiff requested an accommodation, and (2) that it

was plainly obvious that the accommodation was reasonable and necessary. *See id.* Upon a

---

these medical records cannot be used to demonstrate the absence of a genuine issue of fact at summary judgment. The only possible use for these records is as impeachment evidence on cross-examination at trial. Fed. R. Evid. 608 ("extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of the witness."). Plaintiff does not concede, however, that these records will be admissible even for that purpose. *See* Fed. R. Evid. 403; Fed. R. Evid. 701; and argument *supra* (records contain impermissible lay opinion).

[10]     Defendants did not address the deliberate indifference standard in their moving papers, instead arguing more broadly that Plaintiff's Rehabilitation Act claim fails because effective communication did in fact take place. ECF Doc. 58, at 8-10. However, since Defendants *did* address the punitive damages standard, Plaintiff will address deliberate indifference as well for the sake of thoroughness.

[11]     Discriminatory intent is required to obtain damages under the Rehabilitation Act because the remedial provision of that law is modeled after Title VI of the Civil Rights Act. *Meagley*, 639 F.3d at 389. No courts have applied such a requirement to the MHRA, which simply provides that a court may award actual damages to a prevailing plaintiff. Mo. Rev. Stat. § 213.111(2).

showing of deliberate indifference, Ms. Bates is entitled to actual damages, which includes emotional distress damages.[12] *See Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998).

Furthermore, in addition to compensatory damages, the MHRA authorizes an award of punitive damages to a prevailing plaintiff in a discrimination case. Mo. Rev. Stat. § 213.111(2). Punitive damages are authorized in part because "discrimination is so insidious in society that the legislature has found it necessary to allow the assessment of punitive awards to punish the wrongdoing and deter future discriminatory conduct." *Holmes v. Kansas City Missouri Bd. of Police Com'rs ex rel. Its Members*, 364 S.W.3d 615, 628 (Mo. Ct. App., W.D. 2012) (citation omitted). There is no requirement that a plaintiff must show direct evidence of intentional misconduct to obtain punitive damages; rather, "[p]unitive damages may be awarded on a showing that the defendant intentionally and knowingly committed a wrongful act 'without just cause or excuse.'" *Id.* (citing *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 870 (Mo. Ct. App., E.D. 2009)); *see also Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 109 (Mo. Ct. App., E.D. 2006). Punitive damages are also warranted upon a showing of "reckless indifference to the rights of others." *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 520 (Mo. 2009).

Here, Plaintiff has presented more than enough evidence to send her claims for both compensatory and punitive damages to a jury. The record shows that Ms. Bates requested an interpreter "over and over and over again," even after Defendants' staff tried using written notes and a communication board, which is enough to put the Defendants on clear notice that their

---

[12]    Defendants concede that Ms. Bates suffered emotional distress at Delmar Gardens North. PSOF ¶ 136; *see also* PSOF ¶ 155 (Plaintiff suffered frustration and depression, and wanted to leave Delmar Gardens North due to the lack of an interpreter); *see also Toth v. Barstow Unified Sch. Dist.*, No. 12 Civ. 2217, 2014 U.S. Dist. LEXIS 169669, at *7–8 n.11 (C.D. Cal. Dec. 8, 2014) ("Compensatory damages, under § 504 of the Rehabilitation Act, include emotional distress damages.").

communication with Ms. Bates was not effective. PSOF ¶¶ 149–51. Defendants' only response to these requests was to place two phone calls: one to a community college that had never provided an interpreter to Delmar Gardens North before, and another to a "former volunteer with ties to the deaf community" (and none to an actual interpreting agency). *Id.* ¶¶ 76–78. Indeed, Defendants' staff did not just fail to obtain an interpreter for Ms. Bates—they affirmatively declined her request for one, causing Ms. Bates to go so far as to request to be transferred *back to DePaul*, where she was provided an interpreter. *Id.* ¶¶ 149–50. Defendants' disregard for Ms. Bates's rights is confirmed by the fact that Defendants did not, and still do not, have any policies addressing how to accommodate residents with hearing impairments. *Id.* ¶ 156. Nor do Defendants train their employees on when or how to provide interpreter services. *Id.* ¶ 157. This evidence is enough to show that Defendants acted both intentionally and with "reckless indifference" to Ms. Bates's right to effective communication.

### D.  Plaintiff Is Entitled to Injunctive Relief

Plaintiff has standing to seek injunctive relief, as authorized by the ADA, the Rehabilitation Act, and the MHRA. 42 U.S.C. § 12188(a)(1); 29 U.S.C. § 794(a); Mo. Rev. Stat. § 213.111(2). Indeed, injunctive relief would be an entirely appropriate remedy in this case.[13] The ADA is a remedial civil rights law designed to "provide a clear and comprehensive national mandate for the elimination of discrimination against persons with disabilities." 42 U.S.C. § 12101(b)(1). Thus, Congress stated that a primary purpose of the ADA is "to provide clear, strong, consistent,

---

[13]     Indeed, courts across the country have found standing for deaf individuals to seek injunctive relief against medical providers. *Benavides v. Laredo Med. Ctr.*, No. CIV.A. L-08-105, 2009 WL 1755004, at *5 (S.D. Tex. June 18, 2009); *Majocha v. Turner*, 166 F. Supp. 2d 316, 325 (W.D. Pa. 2001); *Dudley v. Hannaford Bros. Co.*, 146 F. Supp. 2d 82 (D. Me. 2001); *Aikins v. St. Helena Hospital*, 10 A.D.D. 544 (N.D. Cal. 1994); *Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1166 (E.D. Mich. 1994).

enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). In furtherance of this purpose, Congress created a private right of action for injunctive relief and attorneys' fees. *See* 42 U.S.C. § 12188(a).

Plaintiff has presented evidence that Defendants' discriminatory behavior is likely to continue. Ms. Bates is an 81-year-old woman who has already had surgery requiring rehabilitation on one of her hips. PSOF ¶¶ 2, 31. She has no plans to move from her home in Florissant, Missouri. *Id.* ¶ 18. Ms. Bates testified that if she needed rehabilitative care in the future, she would not go to Delmar Gardens North. *Id.* ¶ 143. The fact that she is deterred from returning to Delmar Gardens North because of the discrimination she suffered supports her legal standing to seek injunctive relief. *Sawczyn v. BMO Harris Bank Nat'l Ass'n*, 8 F. Supp. 3d 1108, 1112–13 (D. Minn. 2014) (citing, e.g. *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002)). As already mentioned, Defendants still do not have any policies addressing how to accommodate residents with hearing impairments, and do not train their employees on when or how to provide interpreter services, meaning there is a sufficient likelihood that the discriminatory conduct will continue. *See id.*; PSOF ¶¶ 156–57. Therefore, Plaintiff remains entitled to injunctive relief.

## CONCLUSION

Defendants cannot establish the lack of a genuine dispute regarding whether they ensured effective communication with Ms. Bates throughout her medical care. Accordingly, their proposed motion for summary judgment should be denied.

Respectfully submitted,

EISENBERG & BAUM, LLP

By: /s/ Andrew Rozynski, Esq.
By: /s/ Philip M. Black, Esq.

24 Union Square East, Fourth Floor
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com
pblack@eandblaw.com
*Attorneys for Plaintiff*

18

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing, along with Plaintiff's Local Rule 7-4.01(E) Statement, and Exhibits 1–8 hereto, was filed electronically with the Clerk of the Court to be served by the Court's electronic filing system this 4th day of August, 2017.

_____

Andrew Rozynski, Esq.