BETSY BATES,                )
                                  )
              Plaintiff,      )
                                  )
        vs.                 )     Case No.  4:15-CV-00783-AGF
                                  )
DELMAR GARDENS NORTH,   )
INC., et al.,                 )
                                  )
              Defendants.    )

## MEMORANDUM AND ORDER

Plaintiff Betsy Bates, who is profoundly deaf, was treated for rehabilitative care at Defendants' skilled nursing facilities in May 2013.  Plaintiff claims in this action that Defendants failed to provide necessary and reasonable accommodations in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182; Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794; the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.065; and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619.  Defendants Delmar Gardens North Operating LLC ("DG North") and Delmar Gardens North, Inc., have moved for summary judgment (ECF No. 57) and to exclude the testimony of Plaintiff's expert, Judith Shepard-Kegl, Ph.D. (ECF No. 61). For the reasons stated below, both motions will be granted in part and denied in part.

## BACKGROUND

For purposes of the motions before the Court, the record establishes the following. Plaintiff is 81 years old and has been deaf since birth.  Plaintiff communicates

proficiently in American Sign Language ("ASL") and has only a limited ability to communicate in written and spoken English. On May 14, 2013, Plaintiff underwent hip surgery at DePaul Hospital in St. Louis. Following her surgery, Plaintiff remained at the hospital for four days, where she began physical therapy for her hip. An ASL interpreter was present during at least some of the time that Plaintiff spent at the hospital.

On May 18, 2013, Plaintiff was transferred from DePaul Hospital to DG North to continue rehabilitative and physical therapy services for her hip. DG North provides rehabilitative services to individuals recovering from physical trauma, including recent surgeries. DG North employs all staff at its facility and owns the operating license for its facility; however, Delmar Gardens North, Inc., owns the land on which DG North operates. DG North accepts federal Medicare and Medicaid funds for patient care.

Plaintiff stayed at DG North for 13 days, during which time she engaged in physical therapy and received medications. Plaintiff requested an ASL interpreter on several occasions, beginning just after her admission and continuing throughout her stay. Plaintiff made these requests using handwritten notes to DG North staff members, stating that she "need[ed] an interpreter so bad," and that she "must have an interpreter." ECF No. 59-2 at 1, 3, 8. In response to one of Plaintiff's requests for an ASL interpreter, a director of nursing at DG North responded, in part: "Unfortunately we don't have an interpreter. We were told that you would be able to communicate well without one." ECF Nos. 59-2 at 1 & 70-6 at 25-26.

After one of Plaintiff's early requests for an interpreter, DG North inquired into the availability of an ASL interpreter by contacting a local community college[1] and contacting a former volunteer at DG North who knew ASL. No ASL interpreter was available through either of these channels. DG North did not make other attempts to obtain an ASL interpreter and never provided Plaintiff with an ASL interpreter, despite continued requests. DG North staff discussed admission documents with Plaintiff, conducted physical therapy, and according to Plaintiff, also discussed discharge documents, without an ASL interpreter present.

DG North provided Plaintiff with a communication board and paper and writing utensils to communicate with staff members, and DG North has attached as an exhibit to its motion the handwritten notes exchanged between its staff members and Plaintiff. ECF No. 59-2. Medical records from DG North also include notations by nurses stating that Plaintiff was "able to make needs known" using "garbled speech," "difficult verbalization," and "sign language"; but that Plaintiff was requesting to go back to DePaul Hospital and was not happy at DG North because DG North did not have an interpreter. *E.g.*, ECF No. 60-1 at 47-48. Plaintiff continued to request an ASL interpreter after she was provided with the communication board and pen and paper.

Using handwritten notes, Plaintiff was able to request and receive from DG North staff a new room, a walker, ice for her hip, and closed captioning for her television.

---

[1] The community college had never provided any interpretation services for DG North before.

Plaintiff's son, as well as two friends,[2] visited Plaintiff at DG North. These visitors did not express concerns to DG North regarding the care Plaintiff was receiving or Plaintiff's ability to communicate with DG North staff.

DG North has a "Hearing Impairment Policy," which provides that for extremely hearing impaired individuals who do not use hearing aids or employ lipreading, DG North staff may need to speak close to the resident's ear or cup their hands around the ear. This policy does not address the need for or use of interpreters for deaf or hearing impaired residents. Nor does DG North train its staff on when and how to provide interpreter services for deaf and hearing impaired residents, contract with any interpreting agency, or display signs informing residents of their right to interpretation services. DG North has not provided ASL or other interpreters for deaf residents in the past, but a representative of DG North testified that she would have hired an ASL interpreter if the need arose and if she was able to find one.

In her deposition, Plaintiff testified, through an ASL interpreter, that she asked DG North staff for an ASL interpreter "over and over again," and that without an interpreter, she could not understand discussions with nurses; she could not understand when meal times were, because this information was verbally told to her before writing materials were provided to her; and she was confused about which medication she was taking because the pills looked different than what she expected.

In a declaration submitted in response to Defendants' summary judgment motion, Plaintiff likewise stated that her primary mode of communication is ASL, that she

---

[2]     One of these friends, Plaintiff's pastor, had interpreted for Plaintiff in the past.

repeatedly requested ASL interpreters during her 13-day stay at DG North, that she was "unable to communicate about many things because [she] did not have access to an [ASL] interpreter," and that she was "in the dark about what was going on, but did [her] best to get by with gestures, limited lip-reading, and basic writing." ECF No. 70-10.

In her deposition and declaration, Plaintiff stated that her experience at DG North caused her frustration and emotional distress. Plaintiff testified in her deposition that she has no current conditions that cause her to believe that she will ever need to return to DG North for care, and that if she ever did need to go to a similar facility in the future, she would not go to DG North.

Plaintiff brought suit on May 18, 2015, asserting claims under (1) Title III of the ADA, (2) Section 504 of the RA, (3) the MHRA, and (4) the FHA. Plaintiff seeks declaratory and injunctive relief (under all counts); compensatory damages for emotional distress (under the RA, MHRA, and FHA); punitive damages (under the MHRA and FHA); and an award of attorneys' fees and costs (under all counts).

Plaintiff has retained as an expert Dr. Shepard-Kegl, a linguist who has extensive experience in the fields of neurolinguistics and signed languages, is fluent in ASL, and is a nationally certified ASL interpreter who has been trained and tested specifically in evaluating interpretation needs. Dr. Shepard-Kegl conducted a four-hour, in-person interview of Plaintiff and formulated an individualized assessment of Plaintiff's communication abilities and needs. In her expert report, Dr. Shepard-Kegl explained her methodology for conducting such assessments as follows:

The standard methodology used in my profession is elicitation and linguistic analysis. The process is very much like the experimental method. A hypothesis is posed and data are elicited to help me to confirm or disconfirm the hypothesis. Standardized testing will not give me the individualized data that I need to inform my opinion. Deaf people are far too diverse and their language backgrounds are very heterogeneous. I need to look at each client in an individualized way, using a single case study methodology. The need for individualized assessment is noted by almost every researcher in the field of deafness, especially regarding reading abilities, but some of these opinions are addressed quite well in the following text.

Mounty, Judith and Martin, David S. (eds.) 2005. *Assessing Deaf Adults: Critical Issues in Testing and Evaluation.* Washington, D.C.: Gallaudet University Press.

That is not to say that I do not at times make use of standard materials that have been developed to assess reading, interpreting proficiency, or ASL proficiency. I just do not apply them in a one-size fits all fashion.

ECF No. 61-1 at 4. The expert report cites the published sources that Dr. Shepard-Kegl relied on, including sources for reading and ASL assessment.

In her deposition, Dr. Shepard-Kegl testified that she has published portions, but not the entirety, of her single-case methodology and that she has applied the methodology to assess approximately 300 individuals over the course of her career. The findings of her individual assessment of Plaintiff are stated in detail in the expert report, including that Plaintiff is fluent in ASL; does not read effectively above a fourth-grade level; and achieved only 53% accuracy in lipreading, which Dr. Shepard-Kegl concluded was insufficient for reliable communication access.

Dr. Shepard-Kegl's expert report contains the following opinions: Plaintiff "needed an ASL interpreter during her stay for rehabilitation, recovery, and physical

therapy at [DG North]"; Plaintiff "was best able to participate in her health care via communication access through an interpreter"; Plaintiff's "written English is insufficient to serve her full needs in this context"; Plaintiff's "writing may have been sufficient for the most basic communication, but not for detailed discussions of her treatment and progress with her therapists and healthcare providers"; and "[t]here is a clear discrepancy between [Plaintiff's] fluency in ASL and her limited fluency in English" in that Plaintiff's "ASL is fluent and offers her the ability to engage with her healthcare providers in a sophisticated way . . . [and] [n]o modality of English (lipreading, speaking, reading, or writing) offers her similar access." ECF No. 61-1 at 77-78.

Dr. Shepard-Kegl also included the following statement in her expert report: "If [Plaintiff] was only admitted [to DG North] because [Defendants] thought she didn't need accommodations, that is no excuse for not providing accommodations when it became evident that an interpreter was needed. To do anything else is to admit to a discriminatory practice of not admitting people who need accommodations." *Id.* at 77.

## ARGUMENTS OF THE PARTIES

### Motion for Summary Judgment[3]

As an initial matter, Defendants argue that Plaintiff lacks standing to pursue a claim under the FHA because she has failed to offer evidence that she dwells or has ever dwelled at DG North, as required to state an FHA claim.

---

[3] Although Defendants' briefs primarily address the actions of DG North, each argument in their motion is asserted on behalf of both Defendants, and Defendants make no separate argument with respect to Delmar Gardens North, Inc.

Next, Defendants argue that Plaintiff's remaining claims fail because the evidence demonstrates that DG North effectively accommodated Plaintiff's disability as a matter of law. Specifically, Defendants argue that, in order to establish a prima facie disability discrimination case under the ADA, RA, and MHRA, Plaintiff must prove that (1) she is disabled within the meaning of the statutes, (2) Defendants are covered entities under the statutes, and (3) Defendants discriminated against Plaintiff based on her disability by failing to reasonably accommodate her disability. Defendants do not dispute that Plaintiff is disabled or that they are covered entities.

With respect to the last element, Defendants argue that accommodations are reasonable in this context as long as they allow for "effective communication" between the parties. Defendants contend that "effective communication" was achieved here as a matter of law because the undisputed facts demonstrate that Plaintiff's ultimate medical goals were achieved and that Plaintiff was able to communicate with DG North staff using handwritten notes. Defendants have also presented evidence that when receiving medical treatment by other providers in the past, Plaintiff has not always used an ASL interpreter, and has at times used written and lipreading to communicate.

Next, Defendants argue that Plaintiff has no standing to pursue injunctive relief because she cannot demonstrate a "real and immediate threat" that she will return to DG North and suffer the same alleged harm in the future.

Finally, Defendants argue that Plaintiff is not entitled to recover punitive damages under the MHRA or FHA (to the extent that claim survives), because there are no facts in

the record to support such an award. Defendants do not make any argument with respect to the compensatory damages sought by Plaintiff.

In response to Defendants' motion, Plaintiff states that she is withdrawing her claim under the FHA. With respect to her remaining claims, Plaintiff argues that there is sufficient evidence to raise a jury question as to whether Defendants failed to ensure effective communication with Plaintiff. Specifically, Plaintiff argues that there is sufficient evidence to demonstrate that she requested an ASL interpreter; that without such an interpreter, she was not able to understand and participate in her own care in a manner substantially equal to non-deaf patients; and that Defendants failed to provide her with this accommodation. Plaintiff also argues that the evidence regarding her past medical treatment by other providers is inadmissible because it constitutes improper lay opinion evidence, after-acquired evidence being improperly used to rebut discriminatory intent, or improper impeachment evidence.

Next, Plaintiff argues that she has demonstrated a sufficient likelihood of future injury as required to seek injunctive relief because Plaintiff is "an 81-year-old woman who has already had surgery requiring rehabilitation on one of her hips," and Defendants still have no policies addressing interpretation services for deaf patients.

Finally, Plaintiff argues that she is entitled to compensatory damages under the RA,[4] and punitive damages under the MHRA, because there is sufficient evidence for a

---

[4]     Although Defendants' motion did not mention Plaintiff's request for compensatory damages, Plaintiff states that "since Defendants *did* address the punitive damages standard, Plaintiff will address deliberate indifference," which Plaintiff acknowledges is required to recover compensatory damages under the RA. ECF No. 69

jury to find that Defendants acted with deliberate indifference to Plaintiff's rights. Specifically, Plaintiff points to the evidence that she continuously expressed a need for an ASL interpreter, Defendants denied her requests and made minimal efforts to obtain an interpreter, and Defendants had not at the time, and still have not, implemented policies or training addressing interpretation services for deaf residents.

In reply, Defendants argue that Plaintiff's pursuit of her FHA claim was not in good faith, and that Defendants are therefore entitled to the attorneys' fees and costs incurred in pursuing their motion for summary judgment on this claim.

Defendants also reassert that the undisputed evidence demonstrates that DG North ensured effective communication with Plaintiff. Defendants contend that the evidence regarding Plaintiff's past medical treatment by other providers is admissible because it is relevant to demonstrate Plaintiff's ability to communicate in medical settings, it is not being offered for the purpose of rebutting an inference of discriminatory intent or impeachment, and it is not improper lay opinion testimony.

Finally, Defendants continue to maintain that Plaintiff lacks standing to pursue a claim for injunctive relief and that the evidence does not support an award of punitive damages under the MHRA. Defendants' reply does not address Plaintiff's argument in support of her request for compensatory damages under the RA or MHRA.

---

at 14 n.10. However, Plaintiff argues that "[n]o courts have applied [a deliberate indifference] requirement to the MHRA, which simply provides that a court may award actual damages to a prevailing plaintiff." *Id.* at 14 n.11.

**Motion to Exclude Expert Testimony**

Defendants have also moved to exclude the opinions and testimony of Plaintiff's expert, Dr. Shepard-Kegl, pursuant to Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants argue that Dr. Shepard-Kegl's testimony will not help the jury understand the evidence or determine any fact in issue because "[a]ny juror proficient in speaking, reading, and writing in English will be able to understand and judge Plaintiff's ability to communicate in English by viewing Plaintiff's written notes with DG North staff and hearing Plaintiff's testimony." ECF No. 62 at 7. Defendants also argue that Dr. Shepard-Kegl's testimony invades the province of the jury by testifying as to legal conclusions.

Further, Defendants argue that Dr. Shepard-Kegl's testimony is not the product of reliable principles and methods because her methodology has not been tested, subjected to peer review, or published. Finally, Defendants argue that Dr. Shepard-Kegl's testimony is not based on sufficient facts or data and is not sufficiently reliable because, for example, she failed to consider the medical records and handwritten notes from Plaintiff's stay at DG North.

In response, Plaintiff argues that Dr. Shepard-Kegl's testimony will be helpful to deciding the fact-intensive issue of Plaintiff's ability to communicate in English, as opposed to ASL, which is highly relevant to Plaintiff's claims. Plaintiffs also argue that Dr. Shepard-Kegl is well qualified to opine on this issue, noting that federal district courts in at least two cases have held that Dr. Shepard-Kegl was qualified to opine on a similar issue using the same methodology used in this case. *See Saunders v. Mayo*

*Clinic*, No. CIV. 13-1972 JNE/HB, 2015 WL 774132, at *2 (D. Minn. Feb. 24, 2015);

*Me. Human Rights Comm'n v. Sunbury Primary Care, P.A.*, 770 F. Supp. 2d 370, 390-93

(D. Me. 2011).

Plaintiff also contends that Dr. Shepard-Kegl's testimony is reliable and

trustworthy, including with regard to the single-case methodology, which Dr. Shepard-

Kegl has applied to hundreds of individuals and which incorporates standard materials

used in this field.  Finally, Plaintiffs argue that any challenge to the factual basis of Dr.

Shepard-Kegl's opinions goes to the weight, rather than the admissibility, of the opinions.

In reply, Defendants reiterate their arguments that Dr. Shepard-Kegl's testimony is

unhelpful and unreliable, and argues that the two cases holding that Dr. Shepard-Kegl's

testimony was admissible are unpersuasive because they did not address the specific

reliability objection raised by Defendants here.

## DISCUSSION

## Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  In ruling on a motion for

summary judgment, a court must view the facts in the light most favorable to the non-

moving party and must give that party the benefit of all reasonable inferences drawn from

the record.  *Combs v. The Cordish Companies, Inc*., 862 F.3d 671, 680 (8th Cir. 2017).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge."  *Id.* (citation omitted).

<u>FHA Claim</u>

The Court will grant as undisputed Defendants' motion for summary judgment on Plaintiff's FHA claim. However, the Court will not consider Defendants' request for attorneys' fees and costs with respect to the FHA claim, which was raised for the first time in their reply brief. *See, e.g., Roper v. Portfolio Recovery Assocs., LLC*, No. 4:14-CV-00729-SWW, 2015 WL 5838473, at *6 n. 9 (E.D. Ark. Oct. 5, 2015). Further, Defendants' request was not supported by legal argument or citation to authorities.

<u>Injunctive Relief</u>

The Court also agrees with Defendants that Plaintiff lacks standing to pursue injunctive relief. "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (citation omitted).

Plaintiff's mere reference to her age and past hip surgery is insufficient to establish a "real and immediate" likelihood that she will return to Defendants' facilities, particularly in light of the undisputed evidence that she has no current conditions that cause her to believe that she will ever need to return to DG North and that she has no intention to so return. *See Meagley v. City of Little Rock*, 639 F.3d 384, 391 (8th Cir. 2011) (holding that a plaintiff could not "establish real and immediate threat as required for standing" to pursue an injunction against a zoo where she "never indicated that she

would return to the Zoo"); *Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 819 (11th Cir. 2017) (unpublished) (holding that patients in their 70s and 80s lacked standing to pursue injunctive relief against a hospital because "the patients' conditions are stable" and "[a]lthough the patients might some day return to Bethesda for treatment, the evidence does not establish a real and immediate likelihood that they will do so").

Disability Discrimination

To assert a claim for disability discrimination under Title III of the ADA and Section 504 of the RA, a plaintiff must show that (1) she is disabled, (2) the defendant is a "place of public accommodation (for ADA purposes) and receives federal funding (for Rehabilitation Act purposes)," and (3) the defendant discriminated against her based on her disability. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 447 (8th Cir. 2013). The parties agree that "a claim under the MHRA is analyzed in the same manner as a claim under the ADA." *Darby v. Bratch*, 287 F.3d 673, 682 (8th Cir. 2002); *see also Mo. Comm'n on Human Rights v. Red Dragon Rest., Inc.*, 991 S.W.2d 161, 168 (Mo. Ct. App. 1999).

As Defendants do not contest the first two elements, the Court will focus on the third. "Discrimination is defined by the ADA as a failure to 'make reasonable modifications in policies, practices, or procedures' that are 'necessary to afford privileges, advantages, or accommodations to individuals with disabilities' or a failure to 'take such steps as may be necessary to ensure that no individual with a disability is treated differently than other individuals because of the absence of auxiliary aids and services.'" *Argenyi*, 703 F.3d at 447-48 (quoting 42 U.S.C. §§ 12182(b)(2)(A)(ii), (iii)

and noting that caselaw interpreting the ADA and the RA are "interchangeable").

Although institutions are not required to "provide all requested auxiliary aids and services," they must provide "reasonable auxiliary aids and services to afford [a disabled person] 'meaningful access' or an equal opportunity to gain the same benefit as his nondisabled peers." *Id.* at 448-49. This inquiry is "inherently fact-intensive and largely depends on context." *Id.* at 449 (quoting *Liese v. Indian River Cty. Hosp. Dist.,* 701 F.3d 334, 342-43 (11th Cir. 2012)).

As relevant here, discrimination occurs "when a hospital fails to provide 'appropriate auxiliary aids and services' to a deaf patient . . . 'where *necessary* to ensure *effective communication.*'" *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831-33 (11th Cir. 2017) (quoting and adding emphasis to 28 C.F.R. § 36.303(c)(1)). This fact-intensive inquiry focuses on "whether the deaf patient experienced an impairment in his or her ability to *communicate* medically relevant information with hospital staff," regardless of whether Plaintiff suffered any "actual adverse medical consequences resulting from ineffective communication." *Id.* at 833. "The ADA and the RA focus not on quality of medical care or the ultimate treatment outcomes, but on the equal opportunity to *participate* in obtaining and utilizing services." *Id.* at 834; *see also Argenyi*, 703 F.3d at 451 (holding that Title III of the ADA and Section 504 of the RA require institutions to "start by considering how [their programs] are used by non-disabled [persons] and then take reasonable steps to provide [a disabled person] with a like experience"). Nor does the deaf patient need to "articulate what information they

were unable to understand or convey," as it would be "exceedingly difficult for a deaf patient to recount a conversation he or she could not hear." *Silva*, 856 F.3d at 833, 35.

Here, upon review of the record, including DG North medical records, the handwritten notes exchanged between Plaintiff and DG North staff, and Plaintiff's deposition testimony and declaration, the Court finds that there is a genuine dispute of material fact as to whether Defendants' failure to offer an ASL interpreter impaired Plaintiff's ability to communicate medically relevant information with hospital staff. *See id.* at 836-39 (finding a dispute of material fact as to ADA and RA claims based in part on deaf patients' sworn declarations that they requested an interpreter many times and were unable to fully understand hospital staff's communications regarding treatment, medication, consent forms, and discharge instructions, notwithstanding evidence that the patients utilized handwritten notes to communicate, "verbalized understanding" of some communications, could not articulate precisely what information they were unable to understand or convey, and suffered no adverse medical consequences).

Defendants' evidence regarding Plaintiff's use of auxiliary aids or services other than interpreters in past medical settings (the contexts of which are not clear from the records themselves) does not alter the Court's conclusion that a fact issue exists regarding Plaintiff's communication needs with respect to her treatment at DG North. *See* 28 C.F.R. § 36.303 ("The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place."). Indeed, the interpretive agency

guidelines accompanying the ADA regulations explain that the type of aids or services necessary for deaf individuals in medical settings may differ depending on the nature and complexity of the treatment provided. *See* 28 C.F.R. Pt. 36, App. A ("Exchange of notes likely will be effective in situations that do not involve substantial conversation, for example, when blood is drawn for routine lab tests . . . . However, interpreters should be used when the matter involves more complexity, such as in communication of medical history or diagnoses, in conversations about medical procedures and treatment decisions, or in communication of instructions for care at home . . . .").

Punitive Damages and Deliberate Indifference

"Section 213.111.2 [of the Missouri Revised Statutes] permits recovery of punitive damages in claims brought under the [MHRA]." *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 520 (Mo. 2009). "Under Missouri law, a plaintiff is entitled to punitive damages if the plaintiff proves by clear and convincing evidence that the defendant's conduct was outrageous because of the defendant's evil motive or reckless indifference to the rights of others." *Id.*; *see also Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 799 (8th Cir. 2013). Likewise, although Defendants did not raise the issue in their motion for summary judgment, Plaintiff must show that Defendants were "deliberately indifferent to the rights secured to her by [the RA] in order to recover compensatory damages" under that statute.[5] *Meagley*, 639 F.3d at 389.

---

[5] As Plaintiff correctly notes, the MHRA does not seem to impose a similar deliberate-indifference standard for compensatory damages.

While it is a close question, a reasonable jury could conclude on this record that Defendants acted with reckless or deliberate indifference. The Court notes in particular the evidence that Defendants had no policy or training in place addressing interpreters for deaf residents, Plaintiff expressed her need for an interpreter throughout her stay, including after other accommodations were provided, and DG North staff noted in their records Plaintiff's frustration in not having an interpreter. *See, e.g.*, *Sutherland*, 686 F. App'x at 816-18 (holding that the evidence supported a finding of deliberate indifference as to a group of deaf patients who requested interpreters but whose requests were denied by hospital staff where the staff was on notice that the alternative accommodations provided were deficient, but not as to another group of deaf patients who gave staff no reason to believe the alternative accommodations were ineffective); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276-77 (2d Cir. 2009) (holding that a reasonable jury could find deliberate indifference where numerous requests for an interpreter were ignored by hospital staff and where one demand for an interpreter was "laughed off," even though there were also facts in the record weighing against a finding of deliberate indifference, including that "the Hospital did have a policy in place to provide interpreters, and [staff] made some efforts . . . to find an interpreter"); *cf. McCullum v. Orlando Reg'l Healthcare Sys., Inc*., 768 F.3d 1135, 1148 (11th Cir. 2014) (granting summary judgment as to deliberate indifference where, although the hospital posted signs stating that interpretation services were available, a deaf patient never requested an interpreter and never informed hospital staff that the written notes and other alternative accommodations provided were ineffective).

## Motion to Exclude Expert Testimony

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule was amended in 2000 in response to *Daubert*, 509 U.S. at 597, which charged trial judges with a "gatekeeping" role to exclude unhelpful and unreliable expert testimony.

"The inquiry envisioned by Rule 702 is a flexible one," designed to exclude "vague theorizing based on general principles" or "unsupported speculation," but not requiring an opinion to be "a scientific absolute in order to be admissible." *Adams v. Toyota Motor Corp.*, No. 15-2507, 2017 WL 3445112, at *5-6 (8th Cir. Aug. 11, 2017), *as corrected* (Aug. 14, 2017). An expert opinion "should be liberally admitted if it rests upon good grounds, based on what is known, and doubts about the usefulness should be resolved in favor of admissibility." *Hill v. Sw. Energy Co.*, 858 F.3d 481, 485 (8th Cir. 2017) (citation omitted).

The Court believes that Dr. Shepard-Kegl's testimony will be helpful to the jury in determining Plaintiff's communication abilities and interpretation needs, a subject area in which Dr. Shepard-Kegl is well qualified. However, the Court will not permit Dr. Shepard-Kegl, who is not a lawyer, to opine as to legal conclusions or to invoke legal terms of art.

Therefore, the Court will permit Dr. Shepard-Kegl to testify regarding her opinions as to, for example, the difficulties Plaintiff would have had in communicating during her stay at Defendants' facilities without an ASL interpreter; and the limited utility of Plaintiff's lipreading and written or spoken English skills for communication access under these circumstances, as compared to ASL.

 However, the Court will not permit Dr. Shepard-Kegl, who is not a lawyer, to opine as to legal conclusions or to invoke legal terms of art. Therefore, the Court will grant Defendants' motion to exclude Dr. Shepard-Kegl's opinions as to whether Plaintiff "needed" an ASL interpreter during her stay at Defendants' facilities, whether the accommodations provided by Defendants ensured "effective" communication, and whether Defendants "discriminated" against Plaintiff. *See Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213-14 (D.C. Cir. 1997) (holding that while "[i]t may well be permissible for an appropriate expert to testify as to the difficulty [a deaf individual] would have communicating with [the defendant] under the circumstances . . . [and] for an appropriate expert to testify concerning the relative merits of alternative forms of communication," it was error to allow an expert to testify to testify as to legal

conclusions or invoke "legal term[s] of art" under the ADA, such as "whether a particular form of communication [was] 'as effective' as another").

Defendants' argument as to the factual basis for Dr. Shepard-Kegl's testimony is without merit. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005) (citations omitted).

Likewise, the test for admissibility is not so rigid as to preclude Dr. Shepard-Kegl's testimony because her methodology is somewhat unique. A review of Dr. Shepard-Kegl's expert report and deposition reveals that she relied on standard materials in her field in forming her methodology, has published portions of her methodology, has applied the same methodology to assess the communication needs and abilities of approximately 300 individuals, and applied her methodology to Plaintiff by means of an extensive in-person assessment. There are sufficient indications of reliability here. *See Ulibarri v. City & Cty. of Denver*, No. 07-CV-01814-WDM-MJW, 2011 WL 2559838, at *8 (D. Colo. June 28, 2011) (rejecting an assertion that an expert opinion regarding a deaf individual's communication abilities should be excluded on the ground that it applied methodology that had not been tested or subject to peer review or known error rates, because the expert "testified that the method she used . . . relied on the types of data typically used in her field, including accepted tests normed for the deaf population," even if the expert had not personally interviewed the individual); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999) (holding that "*Daubert's* list of specific factors,"

including testing, peer review, error rates, and acceptability in the relevant scientific community, "neither necessarily nor exclusively applies to all experts in every case").

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED in part**, as to Plaintiff's claim under the Fair Housing Act and Plaintiff's request for injunctive relief, and otherwise **DENIED**, as set forth above.  ECF No. 57.

**IT IS FURTHER ORDERED** that Defendants' motion to exclude the opinions and testimony of Plaintiff's expert Judith Shepard-Kegl is **GRANTED in part**, as to legal conclusions and legal terms of art, and otherwise **DENIED**, as set forth above.  ECF No. 61.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 13th day of September, 2017.